# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**BARBARA A. TALBERT**
        **Plaintiff,**

    **v.**                          **Case No. 17-C-1633**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social Security Administration**
        **Defendant.**

## DECISION AND ORDER

Plaintiff Barbara Talbert applied for social security disability benefits, alleging that she could no longer work due to chronic back and foot pain. The Administrative Law Judge ("ALJ") assigned to the case accepted that plaintiff experienced pain but concluded that she remained capable of a range of sedentary work, consistent with her past employment. Plaintiff seeks judicial review of that determination.

## I. LEGAL STANDARDS

### A.   Disability Standard

Under the Social Security Act, a person qualifies as disabled if she is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 214 (2002) (citing 42 U.S.C. §§ 423(d)(1)(A), § 1382c(a)(3)(A)). The agency has adopted a sequential, five-step test for determining disability. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

At step one, the ALJ asks whether the claimant is currently working, i.e., engaging in "substantial gainful activity" ("SGA").  If not, the analysis proceeds to the second step, where the ALJ determines whether the claimant suffers from any "severe" impairments.  An impairment is "severe" if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

If the claimant has severe impairment(s), at step three the ALJ determines whether any of those impairments meet or medically equal the requirements of one of the conclusively disabling impairments listed in the regulations (the "Listings").  If the impairments do not meet or equal a Listing, the analysis proceeds to the fourth step, which involves a determination of whether the claimant has the residual functional capacity ("RFC") to return to her past relevant work.  RFC is the most an individual can still do, on a regular and continuing basis, despite her impairments.  SSR 96-8p, 1996 SSR LEXIS 5, at *5.  At step four, a claimant will be deemed "not disabled" if it is determined that she retains the RFC to perform the actual functional demands and job duties of a particular past relevant job or the functional demands and job duties of the occupation as generally required by employers throughout the national economy.  SSR 82-61, 1982 SSR LEXIS 31, at *4.  In evaluating a job as performed, the ALJ will often rely on the claimant's reports and statements regarding how she did the job.  In evaluating the job generally, the ALJ will often rely on the generic job descriptions contained in the Dictionary of Occupational Titles ("DOT").  Id. at *5.  Some jobs "have significant elements of two or more occupations and, as such, have no counterpart in the DOT."  Id.  When dealing with one of these so-called "composite jobs," the ALJ will focus on the job as performed.  See, e.g., Michalski v. Berryhill, No. 16-C-1590, 2017 U.S. Dist. LEXIS 149090, at *17 (E.D. Wis. Sept. 14, 2017).

2

Finally, if the claimant cannot perform her past work, the inquiry proceeds to the fifth and final step, which involves a determination of whether she can, given her age, education, work experience, and RFC, make the adjustment to other work in the national economy. The claimant bears the burden of presenting evidence at steps one through four, but if she reaches step five the burden shifts to the agency to show that the claimant can make the adjustment to other work. The agency may carry this burden by relying on the Medical-Vocational Guidelines (i.e., the "Grid"), a chart that classifies a person as disabled or not disabled based on her age, education, work experience, and exertional ability, or by summoning a vocational expert ("VE") to offer an opinion on other jobs the claimant can do despite her limitations. E.g., McQuestion v. Astrue, 629 F. Supp. 2d 887, 892 (E.D. Wis. 2009).

**B.      Standard of Review**

The court will reverse an ALJ's decision only if it is not supported by "substantial evidence" or if it is the result of an error of law. Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Chavez v. Berryhill, 895 F.3d 962, 968 (7th Cir. 2018). The reviewing court may not re-weigh the evidence, make independent credibility determinations, or otherwise substitute its judgment for the ALJ's; if conflicting evidence would allows reasonable minds to differ as to whether the claimant is disabled, the court must defer to the ALJ's resolution of that conflict. See Brown v. Colvin, 845 F.3d 247, 251 (7th Cir. 2016); Stepp v. Colvin, 795 F.3d 711, 718 (7th Cir. 2015); Beardsley v. Colvin, 758 F.3d 834, 836-37 (7th Cir. 2014). Finally, while the ALJ must in rendering her decision build a logical bridge from the evidence to his conclusion, she need not provide a complete written evaluation of every piece of testimony and evidence. Pepper v. Colvin, 712 F.3d 351, 362 (7th Cir. 2013).

## II. FACTS AND BACKGROUND

### A.    Medical Evidence

Plaintiff alleged that she became disabled as of May 8, 2013.  The agency collected the pertinent medical records from before and after that alleged onset date.

In October 2011, plaintiff began seeing Dr. Roman Berezovski, a pain management physician, for low back pain.  (Tr. at 263-64.)  In a January 27, 2012, certification, Dr. Berezovski indicated that he expected plaintiff to experience a severe flare-up of pain, preventing her from working, once every two to three months.  (Tr. at 264.)  On January 31, 2012, Dr. Berezovski provided a slip excusing plaintiff from work from January 27 through January 30.  (Tr. at 306.)

On August 30, 2012, plaintiff saw Dr. Jason Boudreau, a podiatrist, for recurring gout flare-ups.  She had taken prednisone, which helped, but Dr. Boudreau indicated that was not a long-term solution.  Plaintiff denied pain in any other part of her body and admitted that she had not been doing recommended stretching exercises.  (Tr. at 413.)  Dr. Boudreau advised plaintiff that she could not be on steroids several times per year and needed to get her uric acid level under control.  He sent her for an arthritis panel.  (Tr. at 414.)

Plaintiff returned to Dr. Boudreau on October 16, 2012, reporting severe pain in both feet, which she related to a recent move into a new house.  She indicated that she could barely walk and could not work, as her job required her to be on her feet all day.  She also reported a history of gouty arthritis, for which she received steroid packs in the past, but this pain was different, more in her heels.  On exam, she had a severely antalgic gait, with severe pain on palpation of the plantar fascia.  However, range of motion was excellent and muscle strength

4

5/5 bilaterally.  (Tr. at 266.)  Dr. Boudreau diagnosed plantar fasciitis and provided cortisone injections to both feet.  He also instructed plaintiff to wear tennis shoes with arch support; she had not yet bought arch supports.  (Tr. at 267.)

On November 6, 2012, plaintiff told Dr. Boudreau that the injection "amazingly improved" her pain.  (Tr. at 403.)  He provided a second injection and told her to do stretching exercises.  (Tr. at 404.)  On November 12, Dr. Berezovski provided injections to treat plaintiff's back pain.  (Tr. at 335.)

On December 27, 2012, plaintiff returned to Dr. Boudreau, requesting a third injection to get rid of the rest of her discomfort, which the doctor provided.  (Tr. at 398.)  She was also reminded of the importance of compliance with stretching exercises and wearing orthotics, which she had not been doing.  (Tr. at 399.)

On January 3, 2013, plaintiff saw Dr. Berezovski regarding her low back pain, which she related to accidents on October 21, 2011 and December 31, 2012.  (Tr. at 269.)  Plaintiff also reported treatment for depression from 2005-08, with her symptoms improving a lot.  Regarding her back, plaintiff reported that the pain was severe and did not vary much.  Washing and dressing increased the pain, but she managed not to change her way of doing it.  She could lift only very light weights and could not walk at all without increasing pain.  She also avoided sitting because it increased the pain.  She could not stand for longer than 10 minutes without increasing pain.  Pain had also restricted social life to her home.  (Tr. at 270.)  On exam, she was alert, cooperative, and oriented.  She had a limping gait, with an antalgic lean to the right, mildly decreased range of motion of the cervical spine, and moderately decreased range of motion of the lumbar spine.  (Tr. at 271.)  She displayed tenderness of the cervical spine, but tests for foraminal compression were negative. Evaluation of the lumbar spine revealed tender

areas; plaintiff also reported radiating pain during the test. (Tr. at 272.) Strength was 5/5 throughout the upper and lower extremities bilaterally. Dr. Berezovski diagnosed lumbosacral spondylosis without myelopathy, lumbago (low back pain), degeneration of lumbar disc, lumbosacral spondylolysis, sprains and strains of the foot, and cervicalgia. Plaintiff reported 90% improvement following the November 12 injection, though the pain increased after the December 31, 2012 accident. Dr. Berezovski decided to do a repeat injection. She appeared to be taking medications appropriately, without side effects, and the medications helped with activities of daily living, pain control, and functions. Dr. Berezovski continued her on Oxycodone. (Tr. at 273.) He also recommended a rehabilitation program to maintain functioning, range of motion, flexibility, and strength, providing a referral to physical therapy. (Tr. at 274, 342.) On January 7, Dr. Berezovski provided the injection. (Tr. at 319.) On January 8, a physician's assistant provide a slip indicating plaintiff could return to work on January 10, with no prolonged sitting, standing, or walking (more than one hour without breaks to change positions). (Tr. at 331.)

On January 16, 2013, plaintiff returned to Dr. Berezovski with continued lower back pain, made better by medication and resting, aggravated by bending, lifting, and prolonged sitting standing, and walking. (Tr. at 275.) She also complained of bilateral leg pain. (Tr. at 275-76.) She indicated that pain prevented her from walking more than 1/4 mile or sitting/standing for more than 10 minutes. (Tr. at 276-77.) On exam, she was again alert, cooperative, and oriented. She had a limping gait, with an antalgic lean to the right, mildly decreased range of motion of the cervical spine, and moderately decreased range of motion of the lumbar spine. (Tr. at 277-78.) She displayed tenderness of the cervical spine, but tests for foraminal compression were again negative. (Tr. at 278.) Evaluation of the lumbar spine revealed tender

6

areas, and plaintiff again reported radiating pain during the test. (Tr. at 278-79.) Strength was 5/5 throughout the upper and lower extremities bilaterally. (Tr. at 279.) Dr. Berezovski diagnosed lumbago (low back pain), lumbosacral spondylolysis, and cervicalgia. Plaintiff expressed distress regarding her job with Milwaukee County, and she was working with her supervisor regarding restrictions. The repeat injection on January 7 produced less than 50% improvement. (Tr. at 279.) Dr. Berezovski increased her Oxycodone and again recommended a rehabilitation program. (Tr. at 280.) On January 16, Dr. Berezovski provided a slip indicating that plaintiff could return to work on January 17. (Tr. at 299.)

On January 31, 2013, plaintiff reported 20% improvement in her condition overall and 40% since her last visit. (Tr. at 281.) She indicated that the pain prevented her from walking more than 1/4 mile or sitting/standing longer than ½ hour. (Tr. at 282.) Physical exam revealed the same findings as previously. (Tr. at 282-85.) Her cervical pain was significantly improved, and she was working for Milwaukee County without restrictions. She had received an ergonomic chair, which helped. Dr. Berezovski prescribed Oxycontin. (Tr. at 285.) She had not yet scheduled an appointment with the chiropractor but intended to do so. (Tr. at 285-86.) They planned another lumbar epidural injection. (Tr. at 286.)

Also on January 31, 2013, plaintiff saw Dr. Boudreau, the podiatrist, for evaluation of her plantar fasciitis. She had been severely non-compliant with stretching exercises. She stated she had been doing well since her third injection to her right foot on December 27, 2012. She indicated that she only got pain in the morning when she got out of bed for a few minutes or when she had been sitting for a long period of time getting back up. Dr. Boudreau indicated he wanted to get plaintiff back to physical therapy. Plaintiff indicated she had been in a car accident on December 31, 2012, and reported needing therapy for her back as well. (Tr. at

7

394-95.)  Otherwise she was doing really well.  On exam, swelling was gone and strength normal.  Dr. Boudreau wanted her to go to therapy to try to get her to become compliant with stretching exercises.  He also informed her she should be wearing supportive shoes with arch supports; she came in that day wearing sloppy boots with no support.  "Of note, the patient was on the phone paying one of her bills over the phone during most of the visit this date."  (Tr. at 395.)  Dr. Boudreau held off on further injections since most of her pain was gone; she was to have therapy to get rid of the rest.  She was informed of the importance of compliance with her stretching and wearing good supportive shoes.  (Tr. at 395.)

On February 20, 2013, Dr. Berezovski provided a slip indicating that plaintiff could not work on that day due to some temporary increased pain and discomfort from a procedure she had on February 18.  She could return to work on February 21, 2013.  (Tr. at 299.)

On April 8, 2013, plaintiff returned to Dr. Berezovski, with continued pain in her low back and bilateral legs.  She reported a severe exacerbation on Friday-Saturday, which she related to strenuous activity at work on Thursday, requiring her to go to the ER, where she received a morphine shot and fentanyl patch.  That treatment helped initially, but her pain was now returning.  (Tr. at 287.)  Physical exam findings were essentially the same as previous visits. (Tr. at 288-91.)  Dr. Berezovski diagnosed neuritis or radiculitis thoracic, pain in the thoracic region, lumbosacral neuritis or radiculitis, and degeneration of lumbar disc.  (Tr. at 291.)  He discontinued Oxycontin and started plaintiff on Duragesic patch, with Oxycodone for breakthrough pain.  (Tr. at 291-92.)  For inflammatory pain, he started a Medrol Dosepak.  He also ordered a thoracic MRI and provided a slip excusing her from work until April 12, 2013. (Tr. at 268, 292, 317.)

On April 26, 2013, plaintiff underwent a thoracic MRI, which revealed normal alignment

of the thoracic spine, disc dessication throughout the thoracic spine, and no focal disc pathology. (Tr. at 326.) On April 29, Dr. Berezovski completed a certification of serious health condition indicating that plaintiff would experience flare-ups one or two times every one to two months lasting three to four days per episode. (Tr. at 351.)

On May 23, 2013, plaintiff followed up with Dr. Berezovski, with continued lower back pain. She also stated she had been under a lot of stress since she lost her job. She reported 30% improvement overall and since her last visit. (Tr. at 293.) She stated the pain seemed to be getting better but improvement was slow at present. (Tr. at 294.) Physical exam results were again the same. (Tr. at 295-97.) Plaintiff had recently started Nucynta, but that was discontinued due to GI upset and Oxycodone restarted. She would also continue with the Duragesic patch. (Tr. at 297.)

On June 11, 2013, plaintiff commenced physical therapy on the referral of Dr. Boudreau. (Tr. at 366.) She reported foot pain for the past two to three years. She walked with a very antalgic gait and displayed exquisite tenderness to palpation of the soles of the feet. She also displayed reduced strength of the ankles and knees. She reported inability to stand after sitting for prolonged periods without severe foot pain, inability to walk without severe foot pain, and difficulty with stairs. The therapist assessed severe plantar fasciitis, along with chronic low back issues and radiculopathy. Plaintiff was to participate in therapy three times per week for 12 visits. (Tr. at 374.) A June 13 note indicated plaintiff had been compliant with home stretching, and she felt that improved her discomfort. (Tr. at 376.) On June 20, plaintiff reported ability to walk longer before needing a seated rest. (Tr. at 378.) A June 21 note indicated plaintiff moved her appointment, then failed to show. (Tr. at 380.) On June 24, plaintiff underwent a lumbar epidural steroid injection (Tr. at 386), which limited her

9

performance of exercises during her June 27 therapy session (Tr. at 381).  On July 2, plaintiff reported her feet were much better, and she was able to walk around with minimal discomfort in shoes.  She declined orthotics.  She was to continue with home stretching and exercises. (Tr. at 383.)

On October 23, 2013, plaintiff returned to Dr. Berezovski regarding her low back and bilateral leg pain.  She reported trouble finding a doctor, as she had no job or insurance.  She also reported that she just got back from a trip, and all the traveling increased her pain.  She had received Hydrocodone from her primary care physician but was now out.  (Tr. at 449, 452.) On psychological exam, she was alert and oriented, but somewhat frustrated because still had pain.  (Tr. at 450.)  She displayed severely to moderately decreased lumbar range of motion, tenderness on palpation, and positive straight leg raise left and right.  (Tr. at 451.)  Muscle strength of the bilateral upper and lower extremities was grossly within functional limits.  Dr. Berezovski started plaintiff on morphine sulfate, with continued Oxycodone for breakthrough pain.  (Tr. at 452.)

On December 18, 2013, plaintiff returned to Dr. Berezovski for lower back and bilateral leg pain.  (Tr. at 453.)  Exam results were essentially the same as the last visit.  (Tr. at 455-56.) She was given a 10-day supply of MS Contin.  (Tr. at 457.)  On January 30, 2014, exam results were again the same, and the doctor again provided a 10-day supply of MS Contin.  (Tr. at 458-61.)

On March 5, 2014, plaintiff appeared alert, cooperative, and oriented.  She had a limping gait on the left and an antalgic lean to the left.  (Tr. at 421-22.)  Lumbar spine range of motion was moderately decreased, she displayed tenderness on palpation, and straight leg raise tests was positive on the left and right.  (Tr. at 423.)  Lower extremity strength was normal except

10

for the feet (4/5). Dr. Berezovski recommended another steroid injection and continued Oxycodone for breakthrough pain. (Tr. at 424.)

On April 7, 2014, Dr. Berezovski and his physician's assistant, Kristin Pingel, completed a physical RFC questionnaire. The form listed symptoms of pain, fatigue, insomnia, weakness, numbness, and tingling, and clinical findings of limited range of motion and tenderness of the lumbar spine, and disc dessication throughout the spine on MRI. (Tr. at 432.) Based on information obtained through a patient interview, the report indicated that plaintiff's symptoms would frequently interfere with attention and concentration, and that she was incapable of even low stress jobs. (Tr. at 433.) Plaintiff could walk less than one block, continuously sit for 20 minutes and stand for 30 minutes, and in an eight hour day sit about two hours and stand/walk about two hours. (Tr. at 433-34.) She needed to included periods of walking around every 45 minutes for 10 minutes and needed a job that allowed her to shift positions at will from sitting, standing, or walking. She sometimes needed to take unscheduled breaks during an eight-hour workday, two times per hour for 10-15 minutes. She could occasionally lift less than 10 pounds, rarely 10 pounds, never more. (Tr. at 434.) She could rarely twist, stoop, crouch, or climb stairs, and never climb ladders. She could use her arms, hands, and fingers less than 10% of the day for repetitive activities. She would have good and bad days and more than four absences per month. She should avoid extreme temperatures and have an ergonomic environment. (Tr. at 435.)

On May 8, 2014, plaintiff saw Dr. Pamela Thomas King at the Pain Management Treatment Center for lower back pain. (Tr. at 515.) On review of systems, she complained of back pain, joint pain, muscle cramps, stiffness, leg pain at night, difficulty walking, anxiety, and heat intolerance. (Tr. at 516.) On exam, she appeared well developed, well nourished, and

11

no acute distress, with normal gait and station and normal upper and lower extremity strength and range of motion. (Tr. at 517-18.) She also had a normal neurologic and mental status exam. Dr. Thomas King diagnosed spondylosis and degenerative disc disease. (Tr. at 518.) She would consider Oxycodone after reviewing plaintiff's records and provided orders to start physical therapy. (Tr. at 519.) A May 15 Pain Management Treatment Center note indicated that plaintiff was to continue with conservative treatment, medications and therapy. (Tr. at 505, 508.)

On June 16, 2014, plaintiff saw Dr. Berezovski for low back and left hip pain. (Tr. at 437.) On exam, plaintiff was alert and oriented but somewhat frustrated because she still had pain. She was well-nourished, well-developed, and in no acute distress. (Tr. at 438.) Lumbar spine range of motion was moderately decreased. Muscle strength testing was normal except for foot flexors and extensors. (Tr. at 439.) Dr. Berezovski noted that plaintiff's pain was severe enough to require daily, around-the-clock analgesia to improve her quality of life, activities of daily living, and sleep. He continued Oxycodone. (Tr. at 440.)

On July 10, 2014, Dr. Thomas King withdrew from providing further care due to plaintiff's failure to keep appointments and follow the treatment plan. (Tr. at 478.) Therapy notes indicate: "Goals not met due to limited treatment sessions. (Tr. at 479.) The record contains additional physical therapy notes dated December 2014 to January 2015 from Columbia St. Mary's. These notes indicated that she was 15 minutes late for one session, a no call no show for another. (Tr. at 529-20.)

On February 11, 2015, March 11, 2015, and September 2, 2015, plaintiff received lumbar epidural steroid injections. (Tr. at 541, 543, 544.) An April 29, 2015, head CT revealed no acute intracranial process. (Tr. at 542.)

A September 23, 2015, MRI of the right shoulder revealed a full-thickness tear through the mid to posterior fibers of the supraspinatus tendon; mild tendinopathy, biceps tendon; and cystic changes of the greater tuberosity. (Tr. at 539.) On December 14, 2015, Dr. Jeffrey Stephany performed a right shoulder arthroscopy with rotator cuff repair. (Tr. at 548-49.) At a December 29, 2015, follow-up, plaintiff reported doing well and was referred for therapy. (Tr. at 606.)

On January 13, 2016, plaintiff reeceived lumbar medial branch blocks from Dr. Laurie Kabins. (Tr. at 537.) A January 14, 2016 note from Dr. Stephany's office related a contact from the pharmacy about prescriptions for OxyContin from both Dr. Stephany and Dr. Kabins. Dr. Stephany canceled his prescription and indicated that medications should be managed by Dr. Kabins. On being advised of this, plaintiff became very angry and verbally aggressive. (Tr. at 607.)

On January 27, 2016, plaintiff saw Dr. Stephany, doing very well. (Tr. at 608.) On February 9, she again reported doing well until she tripped and fell. On exam, she displayed reduced range of motion compared to last time. She had 5/5 strength internal/external, 4+/5 abduction with moderate discomfort throughout. X-rays showed good overall alignment, and no re-tear was noted on exam. (Tr. at 609.)

On February 24, 2016, Dr. Kabins provided lumbar medial branch blocks. (Tr. at 535.) On March 2, plaintiff returned to Dr. Stephany, doing exceptionally well. On exam, she displayed full strength and range of motion. The doctor noted only: "Common sense restrictions." (Tr. at 610.) On April 20, Dr. Stephany again noted that plaintiff was doing exceptionally well. She reported no pain with most activities, and on exam she displayed full range of motion and 5/5 strength throughout with no pain. (Tr. at 611.)

13

**B.** **Procedural History**

    **1.** **Plaintiff's Application and Administrative Decisions**

Plaintiff applied for benefits in June 2013, alleging a disability onset date of May 8, 2013. (Tr. at 149.) She indicated that she could no longer work due to chronic back pain from arthritis/neuritis, gout, and plantar fasciitis. She indicated that she stopped working on May 7, 2013, because of her conditions and because of other reasons ("I believe I was laid off because of my complaints"). (Tr. at 239.)

In a pain questionnaire, plaintiff reported that she experienced sharp, constant pain in her lower back, hips, and legs since 2005. She also reported pain in her feet. Activities such as sitting, standing, walking, lifting, or bending precipitated the pain. She used medications (Oxycodone and Oxycontin) and received injections for the pain. (Tr. at 182.) The medications caused no side effects. Plaintiff reported that pain interfered with most of her activities and she needed assistance with grocery shopping, laundry, cleaning, and cooking. (Tr. at 183-84.) She could continuously walk 1/4 block, stand 10-15 minutes, and sit 10-15 minutes. Her daughter drove her to run errands. (Tr. at 184.)

In a function report, plaintiff indicated that she was unable to shop for herself, lift bags of groceries, or stand/walk for long periods of time. (Tr. at 193.) The pain interfered with personal care tasks such dressing, bathing, and doing her hair. (Tr. at 194.) She prepared simple meals, but her daughter also helped her. She did little housework due to back and foot pain; her daughter helped with that as well. (Tr. at 195.) She limited driving due to drowsiness from her pain medications. (Tr. at 196.) She denied hobbies other than reading and watching TV, and engaged in limited social activities. (Tr. at 197.) Her conditions limited her to lifting

14

under five pounds and walking 1/4 block. She could pay attention for quite a while unless she got drowsy and followed instructions very well. (Tr. at 198.) However, she did not handle stress or changes in routine well. (Tr. at 199.)

In a third party function report, plaintiff's daughter, Maya Hampton, indicated that plaintiff spent most of her time in bed due to back and foot pain. (Tr. at 185.) Hampton further indicated that the pain made personal care tasks such as dressing and bathing extremely difficult. (Tr. at 186.) When experiencing pain, plaintiff needed assistance with preparing meals. She also needed assistance with chores such as laundry, cleaning, and grocery shopping. (Tr. at 187.)

In a work history report, plaintiff indicated that she held clerical positions for Milwaukee County from February 2002 to May 2013, a receptionist job for a hospital from 1997 to 2000, and a telemarketing job for a sales company from 1997 to 1999. (Tr. at 201, 240.) The clerical work involved lifting less than 10 pounds but lots of standing and walking. (Tr. at 202.) The receptionist job involved lifting less than 10 pounds and was mostly done seated. (Tr. at 203.) The telemarketer job involved no lifting and was also done seated. (Tr. at 204.)

On November 12, 2013, plaintiff underwent an orthopedic disability evaluation set up by the agency with Neal Pollack, D.O. Plaintiff complained of constant back pain, reporting a slip and fall in 2005. She had been doing better but on December 31, 2012,[1] she was involved in another auto accident. She was able to care for her activities of daily living but tended to stay in the house and limit her physical activity. She stated that she could walk about half a block, sit for about 20 minutes, and stand for 20 minutes. She had also been diagnosed with gout

_____

[1]Dr. Pollack listed the date of the accident as "December 31, 2013," but I assume this is a typo given the date of his evaluation.

and tended not to do a lot of walking; she denied using any walking device. She stated that sitting, standing, and driving increased her back pain. She got relief from rest, heat, and gentle massage, in addition to medication. On exam, she was alert and oriented and in no acute distress. Neck and upper extremity motions were normal. Her grip strength was 45 pounds on the right and 40 pounds on the left, and she had normal finger dexterity bilaterally. Knee motions were completely normal. Lift hip abduction was painful. She could get up from a sitting position, get up on her heels and toes, but walked antalgically and slowly. (Tr. at 417.) Lumbar flexion was about 75 degrees and side bending was normal at 20 degrees. She had straight leg sensitivity in her low back at 30 degrees with standing and 90 degrees with sitting. Sensory responses were normal. Lumbar x-rays showed a right upper lumbar metal opacity. The vertebrae showed some mild curvature to the right with very minimal disc space narrowing. There was some mild scalloping of the anterior vertebrae with no foraminal narrowing or other lateralizations. Dr. Polack assessed:

> Chronic low back pain with no signs of any radicular lateralization or reflex dysfunction. She has no voluntary restriction at the ends of lumbar motions and complains of pain with no other major findings. I also examined her feet and she was tender at the soles of her feet, but she had clearly normal ranges of dorsiflexion and plantar flexion. These findings may be compatible with plantar fasciitis.
>
> She is able to do primarily sitting activities with unrestricted hand motions. She should involve herself in a more active lower spinal and leg rehabilitation program.

(Tr. at 418.)

The agency denied the application initially on November 22, 2013 (Tr. at 86, 101), based on the review of Yacob Gawo, M.D., who concluded that plaintiff could perform sedentary work (lifting up to 10 pounds, sitting about six hours in an eight-hour day, and standing/walking about

16

two hours), with frequent balancing and stooping; occasional climbing of ramps/stairs, kneeling, crouching, and crawling; avoidance of concentrated exposure to extreme cold or vibration; and avoidance of even moderate exposure to hazards (machinery, heights, etc.). (Tr. at 81-83.) The agency examiner concluded that based on this assessment plaintiff could perform her past job as a receptionist, which she held from 1997 to 2000. (Tr. at 84.)

Plaintiff requested reconsideration on December 16, 2013 (Tr. at 107), and in a disability report she indicated that her pain had worsened and it was getting harder to care for her personal needs like cooking and dressing (Tr. at 215). In a function report, she indicated that on a usual day would wake up, wash her face, brush her teeth, eat, take medicine, rest, and sleep. (Tr. at 222.) She further indicated that she needed assistance bathing, getting in and out of the tub, and with doing her hair because she could not raise her arms. (Tr. at 223.) Her daughter made her meals, and she could no longer do any cleaning, laundry, or housework. (Tr. at 224.) She did not go out alone because her strong pain medication affected her balance. Her daughter did all of her shopping. She could not lift over two pounds and walk/stand for longer than 15-20 minutes at a time. She reported no social activities other than church when she felt up to it. (Tr. at 226.) She further indicated that she did not handle stress well. (Tr. at 228.)

The agency maintained the denial on March 21, 2014 (Tr. at 100, 108), based on the review of James Greco, M.D., who agreed with Dr. Gawo's assessment (Tr. at 95-97). Plaintiff then requested a hearing before an ALJ. (Tr. at 115.)

### 2. Hearing

On July 19, 2016, plaintiff appeared with counsel for her hearing. The ALJ also summoned a VE to testify. (Tr. at 37-38.)

17

### a.  Plaintiff

Plaintiff testified that she was 54 years old and lived with a friend.  (Tr. at 41.)  Although she had a license, she rarely drove; her daughter brought her to the hearing.  (Tr. at 41-42.) She had a high school level education.  (Tr. at 42.)

Plaintiff testified that she prepared quick meals in the microwave and washed dishes, but her daughter did her laundry because it was downstairs.  (Tr. at 42.)  She shopped with help from her daughter.  (Tr. at 43.)  She had trouble with personal care, such as bathing independently, when experiencing severe pain, which happened a couple times per month. (Tr. at 43-44.)  She belonged to a church and attended services once or twice per month.  (Tr. at 44.)  Other than church and doctor appointments, she rarely went out.  On a typical day, she got up, washed her face, brushed her teeth, and then read scripture and watched TV on the couch.  (Tr. at 45.)

Plaintiff testified that she attempted to work in 2015 as a home health aide but had to leave that job due to shoulder and back pain.  (Tr. at 47.)  She also described her previous work for Milwaukee County.  From 2002 to 2004, she was a legislative assistant, which involved typing, filing, answering the phone, and managing the calendar of a county supervisor.  (Tr. at 47-48.)  That job required her to lift file boxes weighing about 20 pounds.  From 2004 to 2011, she worked as an office assistant in the County human resources department.  (Tr. at 48.) That job involved standing at the counter, waiting on customers, filing, and data entry.  It also involved walking between departments and the same sort of lifting.  (Tr. at 49.)  From 2011 to 2013, she worked as a civil processing clerk in the sheriff's office.  That job also involved working at the counter, processing paperwork, and the same type of lifting.  (Tr. at 50.)  She was fired from that job because she could not keep up with the work and missed days due to

her health issues. (Tr. at 51.) From 2001 to 2002, plaintiff worked as assistant to the manager at the "Institute for Responsible Fatherhood and Family Revitalization." That job involved keeping staff attendance records, light typing, and answering the phone. (Tr. at 51-52.)

Plaintiff testified that she experienced severe, sharp pain in her lower back. (Tr. at 53.) Because of the pain, she could not sit for a long period of time before she had to stand and walk around. She also could not stand for a long period of time. She took pain medications and received injections, which helped for a while. Physical therapy was not helpful, as it was too painful. (Tr. at 54.)

Plaintiff further testified that her feet swelled up, making it hard to walk. (Tr. at 54-55.) She saw a podiatrist, who provided injections. (Tr. at 55.) The ALJ noted the references in the medical records to plaintiff's failure to follow recommendations for stretching exercises and supportive shoes. Plaintiff insisted that she did do the exercises and did buy supportive shoes. (Tr. at 55.) The ALJ also noted the record indicating that plaintiff showed up in boots without any support; plaintiff responded that it was winter time. (Tr. at 56.)

Plaintiff also testified that she had a tear in her right shoulder, which was surgically repaired. (Tr. at 56-57.) She indicated that the shoulder felt good initially, but she was starting to have trouble again, especially pain at night. The ALJ noted that the final record from the treating orthopedist, from April 2016, indicated plaintiff was doing exceptionally well, with no pain during most activities. Plaintiff testified that her condition had changed since then, with her shoulder was bothering her again. (Tr. at 547.)

Plaintiff testified that she took the medications Oxycontin, Oxycodone, Diazepam, Cyclobenzaprine, and Gabapentin. She was not receiving mental health counseling. (Tr. at 58.) She denied side effects from the medication (aside from constipation, for which she had

19

another medication).  (Tr. at 59.)

Plaintiff testified that she could lift a gallon of milk, stand for 30 minutes, walk for 20-30 minutes, and sit for 30-40 minutes.  (Tr. at 59-60.)  She was left-handed.  (Tr. at 60.)  She sometimes had trouble reaching in front of her, and she could not reach over head.  She reported no problems holding objects, picking up a pen and writing.  (Tr. at 61.)  Plaintiff testified that three or four days per week she stayed in bed due to pain.  (Tr. at 62.)

### b.   VE

Asked to classify plaintiff's past work, the VE testified that the legislative assistant position most closely corresponded to the job of "secretary" under the DOT.  The VE explained that the DOT contains a job called "legislative aide," but the duties of that job involve assisting with developing legislation, while plaintiff's description of her job involved secretarial duties.  The DOT classifies secretary as a sedentary, skilled job.  The job was light as plaintiff performed it.  (Tr. at 66.)  The office assistant job corresponded to "personnel clerk" under the DOT, sedentary and semi-skilled, light as performed.  For the sheriff's office job, the closest DOT position was "administrative clerk," light and semi-skilled, also performed at the light level. (Tr. at 66.)  Finally, the assistant to the manager job also corresponded to secretary under the DOT, a sedentary job, but light as performed.  (Tr at 66-67.)

The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and experience, limited to sedentary work, allowing a sit/stand option every 30 minutes lasting for about one minute at the workstation, occasionally climbing stairs and ramps but no ladders, ropes, or scaffolds, frequently balancing and occasionally stooping, kneeling, crouching, and crawling, able to reach in all directions with the dominant arm and reach in front with the non-dominant arm and occasionally overhead with the non-dominant arm, able to

handle, finger, and feel, could not be exposed to extreme cold or vibration, and avoiding uneven terrain, unprotected heights, and hazardous machinery. The VE testified that such a person could perform the secretary and personnel clerk jobs as described in the DOT. (Tr. at 67.)

If the person required up to four additional breaks lasting about 15 minutes each, that would impact any job in terms of productivity. (Tr. at 67-68.) Similarly, three absences per month, on a regular basis, would preclude work. (Tr. at 68.)

The VE indicated that her testimony was consistent with the DOT. The DOT does not distinguish between reaching overhead and reaching forward, and the VE based her testimony on this issue on her experience. (Tr. at 68.)

On questioning by plaintiff's counsel, the VE indicated that a person limited, due to pain or medication side effects, to unskilled work could not perform plaintiff's past jobs. (Tr. at 69.) Counsel asked no questions about the VE's classification of plaintiff's past work under the DOT.

### 3. ALJ's Decision

On September 14, 2016, the ALJ issued an unfavorable decision. (Tr. at 14.) The ALJ determined that plaintiff had not engaged in SGA since May 8, 2013, the alleged onset date. (Tr. at 19.) The ALJ acknowledged that plaintiff performed some work in 2015, but her wages did not rise to the level of SGA. (Tr. at 19-20.)

The ALJ next determined that plaintiff suffered from the severe impairments of degenerative disc disease, degenerative joint disease of the right shoulder, and plantar fasciitis. The ALJ found plaintiff's gout non-severe, as the treatment notes indicated she had managed that condition with no notable complications. (Tr. at 20.) The ALJ also noted that

21

plaintiff received mental health treatment from 2005 to 2008, with her symptoms improving. No treating source diagnosed plaintiff with a mental health condition during the period under review; the ALJ accordingly found that depression and anxiety were not medically determinable impairments. (Tr. at 21.)  None of plaintiff's severe impairments met or equaled a Listing. (Tr. at 21-22.)

The ALJ then found that plaintiff had the RFC to perform sedentary work, with a sit-stand option every 30 minutes lasting one minute; occasionally climbing stairs or ramps; never climbing ladders, ropes, or scaffolds; frequently balancing and occasionally stooping, kneeling, crouching, and crawling; and reaching in all directions with her dominant arm, reaching in front with her non-dominant arm, occasionally reaching overhead with her non-dominant arm, and handling, fingering, and feeling bilaterally.  The ALJ further determined that plaintiff must not be exposed to extreme cold and vibration, and should avoid uneven terrain, unprotected heights, and hazardous machinery.  In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence.  (Tr. at 22.)

Plaintiff initially alleged disability due to chronic back pain, plantar fasciitis, and gout. She reported that she stopped working on May 7, 2013, due to her complaints.  Plaintiff alleged in the disability report filed with her appeal that her pain had worsened, making it harder to take care of her personal needs, such as cooking and dressing. (Tr. at 22.)  In a pain questionnaire, plaintiff described her pain as sharp, stabbing, and throbbing, and occurring when sitting, standing, walking, lifting, or bending.  She also noted that she could walk a quarter block, stand for 10 to 15 minutes, sit for 10 to 15 minutes, and needed assistance to do grocery shopping, laundry, cleaning, and cooking.  In a function report, plaintiff indicated that she could not raise her hands, turn, or bend when her back was hurting.  She noted that she prepares her own

22

meals, performs some household chores, drives, goes to appointments, and shops in stores but often received assistance from her daughter. Overall, her conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and use her hands. At the hearing, plaintiff testified that she could stand for 30 minutes, walk for 20 to 30 minutes, and sit for 30 to 40 minutes. She further testified that she lays around all day due to pain. (Tr. at 23.)

The ALJ concluded that while plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 23.) In support of this finding, the ALJ explained, first, that the objective medical evidence failed to substantiate the severity of the alleged limitations, and, second, that plaintiff's reported daily activities suggested that plaintiff was not as limited as alleged.

Plaintiff presented to a pain management specialist in 2013 for her degenerative disc disease, reporting that she had been involved in motor vehicle accidents in 2011 and 2012. She complained of back, leg, and left foot pain aggravated by prolonged sitting, standing, walking, weight bearing, and daily activities. On examination, she was alert, cooperative, and oriented, but exhibited a limping, antalgic gait. Further evaluation of the cervical spine revealed mildly decreased range of motion with mild pain level and tenderness in the cervical region bilaterally, but negative foraminal compression bilaterally. Lumbar spine range of motion was moderately decreased with moderate to significant pain levels, and lumbar spine evaluation showed tenderness in the lumbar spine, with discomfort and pain on palpation. Plaintiff also reported radiating pain, however, muscle testing revealed 5/5 strength in the upper and lower

extremities and normal pulses. Her treatment plan included medications for pain, a home exercise program, and referral for physical therapy. (Tr. at 23.)

During subsequent visits, plaintiff reported frustration due to pain but was routinely alert, cooperative, and oriented. Her cervical spine range of motion showed mild decrease with no significant changes and mild pain levels. Her lumbar spine range of motion showed moderate decrease and improvement in pain levels. Lumbar spine exams revealed tender areas in the lumbar region on both sides. (Tr. at 23.) However, muscle testing continued to reveal 5/5 strength in the upper and lower extremities with normal pulses. Her treatment plan included continued medications to help with activities of daily living, pain control, and functioning. (Tr. at 24.)

The ALJ noted that while the record included some reports of severe pain and limitation, at other times plaintiff reported improvement in her condition overall. Further, on examination, plaintiff routinely presented as alert, oriented, well nourished, well developed, and in no acute distress. Lower extremity muscle testing revealed 5/5 strength, with some mild decrease of 4/5 strength in foot flexors and extensors. Her treatment plan included long-acting pain medication to improve quality of life, activities of daily living, and sleep. She also received injections, which she tolerated well and provided improvement from pain. Physical therapy notes from May-July 2014 revealed normal muscle tone, strength, and reflexes. However, she was discharged from the program due to limited treatment sessions and non-compliance with her home exercise program. Plaintiff again presented for physical and occupational therapy in December 2014, but her attendance was again an issue. The record contained no additional records for physical therapy. (Tr. at 24.)

In terms of her right shoulder impairment, a September 2015 MRI revealed a full

thickness rotator cuff tear. During an office visit to assess this condition, plaintiff presented as alert and oriented, with an appropriate normal appearance and a normal gait. An examination of her left shoulder showed normal skin appearance, motion, strength, and stability, and her right shoulder showed normal skin appearance and full range of motion with hesitation at 90 degrees. (Tr. at 24.) She exhibited good motion mechanics despite her shoulder injury. (Tr. at 25.) Plaintiff underwent right shoulder surgery in December 2015, with no post-operative complications. During subsequent visits, plaintiff was noted to be doing well and her pain improved. On exam, she was alert, oriented, and had a normal appearance; she continued to exhibit a normal gait. In February 2016, plaintiff fell while at church; however, on examination, her shoulder did not appear to be re-injured. She continued to exhibit a normal gait, showed some hesitation in her shoulder, but had good mechanics, no obvious swelling, active range of motion, 5/5 strength, and moderate discomfort. An x-ray revealed no evidence of acute fracture, good overall alignment, and appropriate position of hardware. (Tr. at 25.) Treatment notes from March and April 2016 indicate that plaintiff was doing exceptionally well, was very happy, and had very limited discomfort. On exam, she was alert, oriented, and had normal appearance. She exhibited a normal gait, full range of motion in her shoulders, and 5/5 strength throughout with no pain. (Tr. at 25.)

In terms of her plantar fasciitis, plaintiff experienced pain flare-ups in her feet and received treatment from a podiatrist. She presented to an outpatient clinic in 2012 with complaints of severe pain in her feet after moving into a new house. On exam, plaintiff exhibited an antalgic gait and some edema but had no excessive swelling, 5/5 muscle strength, and excellent range of motion in all joints. The examining physician noted that plaintiff's pain was due to her increased activity and weight-bearing activity. She received a cortisone

injection and instructions to use arch supports in her shoes. Further examinations indicated that plaintiff was alert, oriented, and in no distress, and injections greatly decreased inflammation and edema. Treatment notes also indicated that plaintiff was not compliant with stretching exercises, nor did she use orthotics or over-the-counter inserts and instead wore boots with no support. (Tr. at 25.) In addition, plaintiff received physical therapy for her foot pain that resulted in improvement of her symptoms. (Tr. at 25-26.) After receiving physical therapy, session notes indicated that plaintiff had significantly less tenderness to palpation, pain turned to soreness, she was able to tolerate the cold better, and she tolerated exercises without increased discomfort. At her last session in July 2013, notes indicated decreased pain, she had become independent with stretches and exercises, and her ongoing treatment plan included continuation of her home exercise program. (Tr. at 26.)

The ALJ noted that while plaintiff alleged difficulty with functions such as walking, standing, lifting, bending, reaching, and climbing due to her physical impairments, she was noted during office visits to be alert, oriented, well developed, well nourished, and in no acute distress. On exams, she showed some decreased range of motion, pain, and at times antalgic gait, but she routinely exhibited full muscle strength and normal reflexes. Further, she had not required assistive devices, repeated emergency room visits, or in-patient hospital stays for her impairments. The treatment notes also referenced improvement from pain medication, physical therapy, and shoulder surgery. The ALJ further noted that the record documented instances on non-compliance with treatment, particularly with exercise, stretching, and use of orthotics, which would provide additional relief from her symptoms and improve overall functioning. (Tr. at 26.)

The ALJ next noted that plaintiff described daily activities that were not as limited as one

would expect given her complaints of disabling symptoms and limitations.  Plaintiff testified that she manages her personal needs, performs some household chores, and prepares meals, shops, and drives.  Moreover, plaintiff attempted to return to work after the alleged onset date, and while that work activity did not amount to SGA, the ALJ concluded that it did suggest plaintiff's activities had at times been somewhat greater than generally reported.  "As such, the undersigned concludes that the record does not establish limitations of the level and severity as the claimant alleged and that would preclude work activity within the residual functional capacity defined in this decision."  (Tr. at 26.)

As for the opinion evidence, the ALJ first discussed the report from Dr. Pollack, who conducted a consultative orthopedic evaluation on November 12, 2013.  Dr. Pollack noted plaintiff's chief complaint as low back pain, and that she could care for activities of daily living but tended to stay in the house and limit her physical activity.  Plaintiff reported that she could walk about half a block, sit for about 20 minutes, and stand for 20 minutes.  On exam, Dr. Pollack found plaintiff alert, oriented, and in no acute distress.  He further found that her cranial nerves were normal, neck and upper extremity motions were normal at all levels, and she had grip strength of 45 pounds on the right and 40 pounds on the left with normal finger dexterity bilaterally.  Dr. Pollack further noted that her knee motions were normal, but she did exhibit pain with left hip abduction, walked antalgically and slowly, and could not do tandem walking, although she could get up from a sitting position and get up on her heels and toes.  Plaintiff also exhibited straight leg raising sensitivity, but sensory responses and reflexes were normal. (Tr. at 26.) Lumbar x-rays showed a right upper lumbar metal opacity, some mild curvature of the vertebrae to the right with very minimal disc space narrowing, and some mild scalloping of the anterior vertebrae with no significant foraminal narrowing.  (Tr. at 27.)

27

Based on his examination, Dr. Pollack opined that plaintiff could do primarily sitting activities with unrestricted hand motions. The ALJ found this opinion consistent with treatment notes indicating that plaintiff showed some decreased range of motion and included reports of pain when standing, walking, and performing weight-bearing activities. Still, plaintiff experienced improvement with her treatment plan when compliant. The ALJ also found Dr. Pollack's opinion supported by treatment notes showing that plaintiff routinely presented as alert, oriented, well developed, and in no acute distress despite her impairments. Plaintiff also retained 5/5 muscle strength in her upper and lower extremities and normal reflexes. Further, Dr. Pollack based his opinion on a thorough, objective examination and first-hand observation of plaintiff, and had knowledge of the disability program. Accordingly, the ALJ gave "considerable weight" to Dr. Pollack's opinion. (Tr. at 27.)

The ALJ next considered the reports from Dr. Berezovski, plaintiff's treating pain physician. Dr. Berezovski completed a certification of plaintiff's condition in January 2012, estimating that the frequency of her flare-ups from severe low back pain would be one time every two to three months. Dr. Berezovski also provided a number of certifications to return to work in 2013. The ALJ found that these opinions supported plaintiff's ability to perform sedentary work and were consistent with treatment notes indicating plaintiff was alert and oriented, with decreased range of motion, tenderness, and pain, but with 5/5 muscle strength and normal pulses. The ALJ also found these opinions supported by plaintiff's earnings record and work history showing that she worked full-time through May 2013. The ALJ therefore gave "considerable weight" to these opinions. (Tr. at 27.)

Dr. Berezovski also signed a physical RFC questionnaire on April 7, 2014, noting that he treated plaintiff monthly since 2011. He listed plaintiff's symptoms as pain, fatigue,

insomnia, weakness, numbness, and tingling. He described her pain as low back pain with radiation to the bilateral legs, moderate to severe, constant, and precipitated by activities of daily living and range of motion. He noted medication side effects such as drowsiness, dizziness, and possible nausea. Dr. Berezovski also noted that he obtained a portion of his responses based on an interview with plaintiff. (Tr. at 27.) He opined that plaintiff's pain and symptoms would frequently interfere with attention and concentration, and she would be incapable of even low stress jobs due to difficulty coping and anxiety. (Tr. at 27-28.) He opined that plaintiff could sit for 20 minutes and stand for 30 minutes at one time; sit, stand, or walk for about two hours in an eight-hour workday; and would need to walk for about 10 minutes every 45 minutes during an eight-hour workday. He further opined that plaintiff would need to shift positions at will from sitting, standing, or walking, and would need unscheduled breaks. Dr. Berezovski opined that plaintiff could occasionally lift and carry less than 10 pounds, rarely 10 pounds, and never 20 pounds or more; rarely twist, stoop, crouch, and climb stairs; and never climb ladders. He further opined that she could handle, finger, and reach less than 10% of the time during an eight-hour workday. He estimated that she would be absent from work more than four days per month due to her impairments or treatment. He also recommended she avoid extreme temperatures and have an ergonomic environment. (Tr. at 28.)

The ALJ acknowledged that, under the regulations, more weight is generally given to the opinions of treating sources because they are most able to provide a detailed, longitudinal picture of the claimant's impairments. If such an opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record, it will be given controlling weight. While Dr. Berezovski was

29

a treating source, the ALJ found his opinion regarding absences and overall limitations not supported by the objective evidence, including her general presentation during office visits as alert, oriented, well developed, and in no acute distress. In addition, Dr. Berezovski's progress notes preceding the date of his opinion indicated mild to moderate decrease in range of motion, mild to moderate pain level, and 5/5 muscle strength (aside from slightly diminished strength of 4/5 in the foot). Further, no treatment notes documented an inability to perform a low stress job, nor was there mental health treatment to support such a limitation. There was also nothing in the record to support limitations in handling and fingering, and plaintiff had no medically determinable impairment of the hands. Finally, the ALJ noted that while Dr. Berezovski signed the questionnaire, a physician's assistant completed it, and a portion of the report was based on an interview with plaintiff. The ALJ thus gave limited rather than controlling weight to this opinion. (Tr. at 28.)

The ALJ next assessed the reports from the state agency consultants, Drs. Gawo and Greco, who found plaintiff capable of a range of sedentary work, with postural and environmental restrictions. (Tr. at 28-29.) The ALJ found these opinions consistent with the record evidence documenting difficulty standing, walking, lifting, climbing, and sitting for prolonged periods, as well as decreased range of motion and mild to moderate levels of pain. Still, the objective evidence demonstrated that plaintiff generally exhibited normal muscle strength and ambulated independently. Further, plaintiff engaged in daily activities such as managing her personal care, cooking, performing some household chores, driving, and shopping. The ALJ also found the proposed environmental limitations consistent with the opinion of plaintiff's treating physician. However, the ALJ noted that the state agency examiners determined that plaintiff could perform past work as a receptionist, a job that ended

in 2000 and thus no longer constituted past relevant work. He accordingly gave their opinions partial weight. (Tr. at 29.)

Finally, the ALJ considered the third-party questionnaire completed by Maya Hampton, plaintiff's daughter. Hampton wrote that plaintiff laid in bed most of the time, experienced disrupted sleep, and had difficulty handling her personal care due to pain. The ALJ found Hampton's report consistent with treatment notes reflecting complaints of pain. However, the ALJ found her opinion regarding the severity and frequency of plaintiff's pain and symptoms, in particular that she lies in bed most of the time, inconsistent with plaintiff's own testimony and treatment records. (Tr. at 29.) The ALJ also found the report unsupported by objective evidence showing mild to moderate pain, 5/5 muscle strength, and improvement when in compliance with her treatment plan. He accordingly gave this report partial weight. (Tr. at 30.)

In sum, the ALJ found that plaintiff's subjective complaints and alleged limitations were not fully persuasive, and the medical evidence did not corroborate plaintiff's allegations of symptoms that would preclude work within the RFC. The objective evidence demonstrated that plaintiff's impairments caused some limitations in her ability to stand, walk, climb, and reach. However, the RFC accommodated those limitations: sedentary exertion and additional postural limitations accommodated her back pain and plantar fasciitis, environment limitations and avoidance of hazards accommodated her pain and possible medication side effects, and reaching limitations accommodated her right shoulder impairment. (Tr. at 30.)

The ALJ then determined that plaintiff could under this RFC perform her past relevant work as a personnel clerk and secretary. The VE identified plaintiff's past work as secretary (sedentary generally, light as performed), personnel clerk (sedentary generally, light as performed), and administrative clerk (light generally and as performed). (Tr. at 30.) The VE

further testified that a person with the RFC set forth in the decision could perform the secretary and personnel clerk jobs, as generally done.  The ALJ accordingly found plaintiff not disabled. (Tr. at 31.)

Plaintiff requested review by the Appeals Council.  (Tr. at 144, 261-62.)  On July 18, 2017, the Council denied her request.  (Tr. at 3.)  This action followed.

### III.  DISCUSSION

Plaintiff argues that the ALJ misidentified her past work; failed to support the RFC determination; and erroneously evaluated the opinion of her treating physician, the credibility of her statements, and her daughter's report.  I address each argument in turn.

### A.    Past Work

Plaintiff argues that the ALJ erred by finding that she could return to two of her past jobs – identified by the VE (generally) as "secretary" and "personnel clerk" – without undertaking a function-by-function analysis of that work.  Failure to conduct this analysis, she contends, requires remand.  (Pl.'s Br. at 7, citing Nolen v. Sullivan, 939 F.2d 516, 519 (7th Cir. 1991); Prince v. Sullivan, 933 F.2d 598, 602 (7th Cir. 1991); Kenefick v. Astrue, 535 F. Supp. 2d 898, 908-09 (N.D. Ill. 2008).)

The Seventh Circuit has rejected the notion that Nolen "requires the ALJ to spell out in detail the demands of each prior job to which the ALJ finds the applicant able to return." Cohen v. Astrue, 258 Fed. Appx. 20, 28 (7th Cir. 2007).  Instead, the court of appeals "has construed Nolen more narrowly, holding that an ALJ cannot describe a previous job in a generic way, e.g., 'sedentary,' and on that basis conclude that the claimant is fit to perform all sedentary jobs without inquiring into any differences in what the job requires while sitting." Id. (citing Smith v.

Barnhart, 388 F.3d 251, 252-53 (7th Cir. 2004)).  The ALJ did not make mistake here; rather, as in Cohen, she considered the "specific jobs" plaintiff held during the relevant period (Tr. at 30), making Nolen inapplicable.  Cohen, 258 Fed Appx. at 28.

Plaintiff relies on Rainey v. Berryhill, 731 Fed. Appx. 519, 523 (7th Cir. 2018), where the court did note the ALJ's failure to do a function-by-function analysis of the claimant's past relevant work under Nolen.  In that case, however, the court further noted that such an analysis would have revealed that the claimant lacked the keyboarding skills and walking ability to perform the past job at issue.  Id.  Plaintiff identifies no similar error here.  See Suzanne M. v. Comm'r of Soc. Sec., No. 1:17-cv-1425-JES-JEH, 2018 U.S. Dist. LEXIS 216632, at *33 (C.D. Ill. Nov. 29, 2018) (relying on Cohen rather than Rainey where the ALJ did not describe the past work in a generic way and considered whether the claimant's restrictions would preclude that work).[2]  Even if, as plaintiff suggests, failure to perform a function-by-function analysis is legal error of its own when the ALJ denies a claim at step four (Pl.'s Rep. Br. at 3), a contention Cohen seems to reject, such errors may be deemed harmless when the claimant identifies no

_____

[2]Kenefick and Prince are also distinguishable.  In Kenefick, 535 F. Supp. 2d at 909, the VE specifically indicated his difficulty in ascertaining the exact skills involved in the claimant's past relevant work, and the ALJ in his decision described that work in the generic way ("sedentary, semi-skilled") forbidden by Cohen and Nolen.  In the present case, as indicated above, the ALJ considered plaintiff's specific past jobs and, as will discussed below, the VE explained the basis for her classifications of those jobs under the DOT.  See Cherry v. Berryhill, No.: 2:16-CV-425-PRC, 2018 U.S. Dist. LEXIS 12625, at *36 (N.D. Ind. Jan. 26, 2018) ("In the instant case, like in Cohen and unlike in Kenefick, the ALJ's consideration of Plaintiff's past work did not consist simply of a generic label of 'sedentary;' rather, the ALJ considered Plaintiff's specific past work as a telephone solicitor and a customer service clerk, which was described by the vocational expert.").  In Prince, the court noted that because "the ALJ failed to make any findings on Prince's RFC, we have no indication of whether Prince could in fact meet the exertional requirements of [his past] job." 933 F.2d at 603.  The ALJ's decision in this case includes a detailed RFC determination (Tr. at 22) and a comparison of that RFC with plaintiff's specific past jobs (Tr. at 30-31).

specific functions of the past work that she could not perform.  See Keys v. Barnhart, 347 F.3d 990, 994-95 (7th Cir. 2003) (stating the doctrine of harmless error is applicable to judicial review of administrative decisions,).

Moreover, plaintiff's Nolen argument overlooks the fact that in the present case the ALJ relied on the testimony of the VE regarding the nature of plaintiff's past jobs.  See, e.g., Doris J. v. Comm'r of Soc. Sec., No. 17-cv-1389-CJP, 2018 U.S. Dist. LEXIS 206148, at *9 (S.D. Ill. Dec. 6, 2018) ("As plaintiff concedes, in most cases, it would be a 'viable argument' that Nolen does not apply where, as here, the ALJ relied on the testimony of a VE to determine that plaintiff could still perform her past job."); see also Metzger v. Astrue, 263 Fed. Appx. 529, 533 (7th Cir. 2008) (rejecting Nolen argument where ALJ relied on VE testimony based on the claimant's description of his previous job).  The ALJ thoroughly questioned plaintiff about the duties of her past jobs (Tr. at 47-51), and the VE, after listening to this detailed testimony, explained why she classified these jobs as secretary, personnel clerk, and administrative clerk under the DOT (Tr. at 65-67); the ALJ then relied on the VE's testimony that a person with plaintiff's RFC could perform the secretary and personnel clerk jobs as generally done (Tr. at 31).  Courts have rejected Nolen arguments under such circumstances.  See, e.g., Melnick v. Berryhill, No. 3:16-CV-532 RLM-MGG, 2017 U.S. Dist. LEXIS 167832, at *14-15 (N.D. Ind. Oct. 10, 2017) (rejecting Nolen argument where ALJ relied on VE who provided a detailed description of the past job and testified that a hypothetical individual with the limitations included in the ALJ's RFC would be able to do that job as generally performed); Archibald v. Astrue, No. 12 CV 326, 2013 U.S. Dist. LEXIS 6387, at *39 (N.D. Ill. Jan. 16, 2013) (rejecting Nolen argument where the ALJ questioned the claimant regarding the demands of her past work and relied on VE testimony regarding the nature of that work).

Plaintiff argues that the VE displayed a questionable understanding of her past work. She contends that her duties in the three positions she held with Milwaukee County between 2002 and 2013 were essentially the same, and the VE classified all of them as light as performed, yet in classifying the work under the DOT the VE labeled two of the jobs sedentary and one light. (Pl.'s Br. at 7.) Plaintiff argues that it was illogical to classify the jobs as sedentary when she testified that she spent most of the day on her feet and lifted up to 20 pounds. (Pl.'s Br. at 8.) However, plaintiff cites no authority for the proposition a VE cannot assign different exertional categories to past work as generally and actually performed. Indeed, such an argument would collapse the distinction, drawn in the regulations, between past work as actually and generally performed.

> A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

SSR 82-61, 1982 SSR LEXIS 31, at *4.

Further, the VE carefully explained why she assigned the specific DOT codes she did (Tr. at 66), and plaintiff did not at the hearing object to the VE's testimony or ask any questions about these classifications, thus forfeiting the argument she raises now.[3] See Brown, 845 F.3d at 254 (holding that failure to object to VE testimony equals forfeiture); Liskowitz v. Astrue, 559 F.3d 736, 744 (7th Cir. 2009) ("As it stands, . . . the VE's testimony was both unobjected to and uncontradicted. Thus, the ALJ was entitled to credit this testimony."); Doris J., 2018 U.S. Dist.

---

[3]Plaintiff does not in her reply brief address forfeiture, even though the Commissioner raised the issue in her response brief.

LEXIS 206148, at *12-13 (finding that ALJ did not err in accepting VE's testimony that claimant could perform past relevant work as generally done where counsel did not object to or question the VE's testimony).

Plaintiff contends that there are DOT codes that better describe her past work than secretary, in particular, DOT # 219.362-010, administrative clerk, a light level job. (Pl.'s Br. at 8-9.) The VE did classify one of plaintiff's past jobs (civil processing clerk for the sheriff's department) under this Code (Tr. at 66), but she explained why the duties of the legislative assistant job more closely aligned with secretary under the DOT (Tr. at 66). While plaintiff disagrees with this testimony, she provides no authority for a reviewing court to second guess the opinion of the vocational expert. See Fifield v. Berryhill, No. 17-C-81, 2017 U.S. Dist. LEXIS 188816, at *46 (E.D. Wis. Nov. 15, 2017) (rejecting similar argument).

> Just as the ALJ may not substitute her own lay opinion for that of a medical expert, it would be inappropriate to substitute the lay opinion of plaintiff's counsel for the vocational expert's expertise, which plaintiff himself acknowledged at the hearing. . . . This court, no more than plaintiff, is not in any position to question the vocational expert's classification of plaintiff's past relevant work on this basis.

Perotin v. Colvin, 110 F. Supp. 3d 1048, 1055-56 (D. Colo. 2015).

As the Commissioner notes, the duties of the secretary job set forth in the DOT align quite well with the duties of the legislative assistant job plaintiff described. (Def.'s Br. at 19.) Under the DOT, a secretary schedules appointments, answers the phone, files and types correspondence;[4] plaintiff testified that in her job she did typing and filing, managed the calendar, and answered the phone. (Tr. at 47.) Given this substantial overlap, any conflicts between the VE's testimony and the DOT were not so obvious that the ALJ should have picked

---

[4]https://occupationalinfo.org/20/201362030.html.

up on them without any assistance.[5]  See Doris J., 2018 U.S. Dist. LEXIS 206148, at *13 (citing

Overman v. Astrue, 546 F.3d 456, 463 (7th Cir. 2008)).

Plaintiff further argues that it is possible her past work involved tasks from more than

one DOT code, making it a composite job and thus precluding the ALJ from considering it as

generally performed.  (Pl.'s Br. at 9.)  However, plaintiff also did not raise this issue at the

hearing, when the VE could have addressed it; nor does she now develop an argument that

her past jobs contained "significant elements" of two or more occupations.  See Dorrie L. B. v.

Comm'r of Soc. Sec., No. 18-cv-0007-CJP, 2018 U.S. Dist. LEXIS 196971, at *12 (S.D. Ill. Nov.

19, 2018) ("The Court agrees that, without more, plaintiff's testimony did not clearly establish

that her past work was a composite job.  Moreover, plaintiff did not object at the hearing or

inform the VE that she considered her past work at First Mid-America to be a composite job.");

see also Kawelo v. Berryhill, 732 Fed. Appx. 584, 587 (9th Cir. 2018) (affirming where the

claimant's counsel did not question the VE on the composite job issue or make any attempt to

establish that her past job did not actually correspond to the relevant DOT classification).

Plaintiff concludes that, had the ALJ gotten all of the information about her past work,

_____

[5]In reply, plaintiff contends that she described this position as requiring lifting up to 20 pounds.  (Pl.'s Rep. Br. at 3.)  Plaintiff's testimony regarding the lifting was equivocal.  "I don't know exactly what the weight of it was.  Like, sometimes boxes filled with files, you know?  The square boxes.  I don't know [how] much that weighs.  A file box, file folder boxes, stuff like that.  The paper, schemes of paper, stuff like that."  (Tr. at 48.)  Asked if it was more than 20 pounds, plaintiff said: "Close maybe."  (Tr. at 48.)  In her pre-hearing work history report, plaintiff indicted that she lifted less than 10 pounds in her clerical jobs with the County.  (Tr. at 202.)  In any event, even if plaintiff was required to lift up to 20 pounds in her particular job, plaintiff fails to demonstrate that this testimony should have caused the ALJ to sua sponte reject the VE's testimony regarding the classification of the past work generally.  See 82-61, 1982 SSR LEXIS 31, at *4 ("A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy.").

and proper evaluation led to a conclusion that the work was light or composite, the result of the case would have been different; at step five, with a sedentary RFC, she would have been deemed disabled under the Grid as of age 50. (Pl.'s Br. at 9.)  Plaintiff does not explain what information about her past work the ALJ failed to obtain;[6] as indicated, the ALJ questioned plaintiff about this issue extensively.  Further, because plaintiff "was represented by counsel at the hearing, she is presumed to have made her best case before the ALJ."  Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017).  Finally, plaintiff's status under the Grid shows only that the ALJ's step four finding would, if erroneous, have been harmful, not that it was wrong.

## B.    RFC

Plaintiff argues that the ALJ's RFC assessment was poorly worded, included limitations the ALJ did not support, and omitted limitations that were supported by the record.  (Pl.'s Br. at 10.)  Plaintiff does not explain how the ALJ's wording amounted to error, and as Judge Griesbach has explained, "Courts should not reverse the Commissioner's decision because a judge does not like the ALJ's writing style.  The question on judicial review is whether the ALJ followed the law and whether substantial evidence supports the Commissioner's decision."  Boeck v. Berryhill, No. 16-C-1003, 2017 U.S. Dist. LEXIS 161683, at *37 (E.D. Wis. Sept. 30, 2017).

Turning to plaintiff's specific complaints, she first contends that the ALJ failed to include

---

[6]Plaintiff contends that the VE expressed confusion regarding plaintiff's 2001 employment with the Institute for Responsible Fatherhood (Pl.'s Br. at 9, citing Tr. at 51-52) and notes that the VE did not have plaintiff's work history form, which plaintiff's counsel filed just before the hearing (Pl.'s Br at 9; Tr. at 46, 65).  However, any error was harmless, as the VE classified the 2001 job in the same manner as the legislative assistant job plaintiff later held with the County, and the VE based her opinion on the "more detailed" testimony plaintiff offered about her work history at the hearing.  (Tr. at 65.)

a sitting limitation in the RFC, despite the fact that plaintiff and her doctors both alleged difficulty in sitting for prolonged periods. (Pl.'s Br. at 10.) However, as plaintiff acknowledges in the next paragraph of her brief, the ALJ included a sit-stand option every 30 minutes lasting for one minute at the work station. (Tr. at 22.) Plaintiff argues that no physician opined that a one-minute standing break was appropriate, but the ALJ need not rely solely on medical opinions in determining RFC.[7] See Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone – not a treating or examining doctor – to decide."). As the ALJ noted, plaintiff testified that she could continuously sit for 30 to 40 minutes, which supports the duration on the sit-stand option. (Tr. at 23, 60.) The ALJ's determination that plaintiff could sit for a total of six hours on an eight-hour day, with periodic changes in position, also drew support from the agency consulting physicians. Dr. Gawo opined that plaintiff could sit for a total of six hours per day but "may need to alternate position from sitting to standing/walking every 2 hour[s] for 5-10 minutes to relieve discomfort. This could be accommodated during normal breaks and lunches." (Tr. at 82.) Dr. Greco opined that plaintiff must "periodically alternate sitting and standing to relieve pain and discomfort." (Tr. at 95.) The ALJ found these opinions consistent with the record reports that plaintiff had difficulty with sitting for prolonged periods.[8] (Tr. at 29.) The record thus contains substantial evidentiary support for a range of sedentary work with a sit-stand option, with the ALJ reasonably setting

---

[7]Plaintiff's doctor opined that she must walk around for 10 minutes every 45 minutes. (Tr. at 434.) The ALJ addressed and discounted this opinion later in his decision. (Tr. at 28.)

[8]The ALJ also considered and gave considerable weight to the opinion of the consultative examiner, Dr. Pollack, that plaintiff could "do primarily sitting activities with unrestricted hand motions." (Tr. at 27, 418.) Dr. Pollack did not mention a need for a sit-stand option.

the sitting duration consistent with plaintiff's testimony and somewhat more stringently than the agency medical consultants thought necessary.[9]

Plaintiff next argues that she testified to difficulty reaching in front of her, and the record showed that she continued to experience shoulder pain after surgery, yet the ALJ included no corresponding limitation. (Pl.'s Br. at 10-11.) The ALJ is not required to include in the RFC every limitation the claimant alleges, only those she accepts as credible. Schmidt v. Astrue, 496 F.3d 833, 845-46 (7th Cir. 2007). Moreover, the ALJ did consider plaintiff's shoulder issue in addressing her ability to reach. Despite the fact that Drs. Pollack, Gawo, and Greco included no reaching restrictions on their opinions, the ALJ considered plaintiff's subjective complaints (Tr at 23, 26) along with the objective medical evidence (which showed good post-surgical recovery with return to full strength and range of motion with very limited discomfort – Tr. at 25) in finding that plaintiff could only occasionally reach overhead with her right arm due to joint disease of the right shoulder (Tr. at 30). Plaintiff believes that the ALJ should have also included limitations in reaching to the front, but she fails to demonstrate error in the ALJ's analysis.

Finally, plaintiff contends that the ALJ made no mention of her need to sleep/rest during the day due to pain, medication side effects, and insomnia due to nighttime pain and sleep

---

[9]In reply, plaintiff contends that the ALJ identified no evidence supporting a finding that she could sit for six hours in an eight-hour day on an ongoing basis (Pl.'s Rep. Br. at 3), but that is incorrect; the opinions of Drs. Gawo, Greco, and Pollack all supported this finding. Plaintiff cites her own testimony and reports regarding her difficulty with prolonged sitting, but the ALJ considered and reasonably discounted those claims. Plaintiff further argues that neither the ALJ nor the Commissioner explained how one minute of standing after every 30 minutes of standing was supported by the evidence cited in the text. (Pl.'s Rep. Br. at 4.) But the ALJ need only "minimally articulate" her reasoning. Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008).

disturbance. (Pl.'s Br. at 11.) Not so; the ALJ discussed plaintiff's reports that she "is always in bed because of the pain" (Tr. at 23); her testimony that she "lay around all day due to pain" (Tr. at 23); her complaints of "disrupted sleep" (Tr. at 29); and her use of "long-acting pain medication" (Tr. at 24) and alleged medication side effects (Tr. at 27). The ALJ found plaintiff's claims of disabling limitations unpersuasive, yet she did not entirely discount plaintiff's allegations, including certain environmental limitations to "accommodate exacerbations of pain caused by her impairments and possible medication side effects." (Tr. at 30.) Plaintiff again believes that the ALJ should have include additional limitations, but she again fails to demonstrate reversible error.[10]

## C.    Treating Physician Opinion

Plaintiff argues that the ALJ erred in discounting the report of her treating physician, Dr. Berezovski. (Pl.'s Br. at 11.) Under the regulations applicable to plaintiff's claim, see Gerstner v. Berryhill, 879 F.3d 257, 261 (7th Cir. 2018) (discussing the rule governing claims filed before March 27, 2017), the ALJ will give a treating physician's opinion regarding the nature and severity of a medical condition "controlling weight" if well supported by medical findings and not

---

[10]In reply, plaintiff insists that the ALJ overlooked her daytime somnolence. (Pl.'s Rep. Br. at 5.) As discussed in the text, the ALJ did discuss this alleged symptom. Plaintiff contends that merely mentioning the symptom in a summary of her complaints does not constitute proper analysis. (Pl.'s Rep. Br. at 5-6.) However, the ALJ is not required to make a separate credibility assessment of each particular statement a claimant makes concerning her symptoms. Boeck, 2017 U.S. Dist. LEXIS 161683, at *51-52; see also Shideler v. Astrue, 688 F.3d 306, 312 (7th Cir. 2012) ("[A]n ALJ's credibility findings need not specify which statements were not credible."). Moreover, the ALJ rejected the contention that plaintiff's impairments forced her to spend much of the day in bed or lying down in discounting the third-party questionnaire from plaintiff's daughter (Tr. at 29-30) and the report of Dr. Berezovski (Tr. at 28). See Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) (noting that the court reads the ALJ's decision as a whole, and it would be a needless formality to require repetition of substantially similar factual analyses).

inconsistent with other substantial evidence in the record. Stephens, 888 F.3d at 328. If the opinion does not meet the test for controlling weight, the ALJ must decide how much value it does have, considering the treatment relationship's length, nature, and extent; the opinion's consistency with other evidence; the explanatory support for the opinion; and any specialty of the treating physician. Gerstner, 879 F.3d at 263. A sound explanation must be provided for rejecting a treating physician's opinion. Hardy v. Berryhill, 908 F.3d 309, 312 (7th Cir. 2018); but see Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulate[d] his reasons – a very deferential standard that we have, in fact, deemed lax.") (internal quote marks omitted).

In the 2014 report, Dr. Berezovski endorsed severe limitations, indicating that plaintiff's symptoms would frequently interfere with attention and concentration and that she was incapable of even low stress jobs (Tr. at 433); that she could walk less than one block, continuously sit for 20 minutes and stand for 30 minutes, and in an eight hour day sit about two hours and stand/walk about two hours (Tr. at 433-34); that she needed to include periods of walking around every 45 minutes for 10 minutes and needed a job that allowed her to shift positions at will; that she needed two unscheduled work breaks per hour for 10-15 minutes (Tr. at 434); that she could use her arms, hands, and fingers less than 10% of the day for repetitive activities; and that she would have good and bad days and more than four absences per month. Finally, he recommended that she avoid extreme temperatures and have an ergonomic environment. (Tr. at 435.)

Acknowledging that, under the regulations, more weight is generally given to the opinions of treating sources, the ALJ found Dr. Berezovski's opinion entitled to limited rather

than controlling weight. She provided several reasons for this conclusion. First, she found his opinion regarding absences and overall limitations unsupported by the objective evidence, including plaintiff's general presentation during office visits as alert, oriented, well nourished, well developed, and in no acute distress, and the progress notes preceding the date of the opinion, which indicated only mild to moderate decreased range of motion, mild to moderate pain level, and 5/5 muscle strength (aside from slightly diminished strength of 4/5 in the foot). Second, no treatment notes documented an inability to perform a low stress job, nor did the record contain mental health treatment to support such a limitation. Third, nothing in the record supported limitations in handling and fingering, and plaintiff had no medically determinable impairment of the hands. Finally, the ALJ noted that, while Dr. Berezovski signed the questionnaire, a physician's assistant completed it, and a portion of the report was based on an interview with plaintiff. (Tr. at 28.)

These are sound reasons. A medical opinion may be discounted if it lacks support in the provider's own treatment notes, Henke v. Astrue, 498 Fed. Appx. 636, 640 (7th Cir. 2012); if it not well supported by objective medical evidence, Zblewski v. Astrue, 302 Fed. Appx. 488, 493 (7th Cir. 2008); if it strays from the provider's area of expertise, White v. Barnhart, 415 F.3d 654, 660 (7th Cir. 2005); or if it is based on the claimant's subjective reports, Alvarado v. Colvin, 836 F.3d 744, 748 (7th Cir. 2016).

Plaintiff appears to concede that the record contain no support for the limitations regarding low stress work and manipulative tasks. However, she argues that this does not mean the rest of the limitations were unsupported. (Pl.'s Br. at 12.) While the ALJ may not selectively consider medical reports, e.g., Gerstner, 879 F.3d at 262; Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009), the ALJ did not make that mistake here; she also considered the other

43

alleged limitations set forth in the report.  Certainly it was reasonable for the ALJ to note, as part of her analysis, that the doctor also included significant limitations for which there was no medical support.

Plaintiff contends that her presentation at office visits (alert, oriented, well nourished, well developed, and in no acute distress) does not necessarily correlate with a lack of pain (Pl.'s Br. at 13), but the ALJ never said plaintiff experienced no pain.  Indeed, the ALJ adopted an RFC for a reduced range of sedentary work due to plaintiff's impairments and associated pain.  (Tr. at 30.)  The ALJ's point was that plaintiff's presentation at office visits undermined her contention that she experienced daily, debilitating pain precluding full-time work.  Plaintiff argues that these observations provide no basis for discounting the opinion regarding absences (Pl.'s Br. at 13), but the opinion on absences appeared to be based on plaintiff's experience of good and bad days (Tr. at 435).  It was not unreasonable for the ALJ to note that, according to the treatment notes, plaintiff did not generally present as being in distress, i.e., having a "bad day," during office visits.

Plaintiff indicates that she suffers from degenerative disc disease of the lumbar spine, degenerative joint disease of the shoulder, plantar fasciitis, and gout, and the record is replete with her complaints of moderate to severe pain.  (Pl.'s Br. at 13.)  The ALJ acknowledged these impairments and accepted that plaintiff experienced pain; however, she rejected the contention that plaintiff experienced daily, debilitating pain, citing substantial record evidence in support of this conclusion.  Plaintiff fails to show reversible error in the ALJ's treatment of Dr. Berezovski's report.[11]

---

[11]In reply, plaintiff faults the Commissioner for merely repeating the ALJ's flawed reasoning.  (Pl.'s Rep. Br. at 6.)  Because the Commissioner's lawyers are, under the <u>Chenery</u>

## D.    Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ's finding that her subjective complaints were "not entirely consistent" with the evidence of record did not satisfy the requirements of SSR 16-3p because the ALJ failed to mention her excellent work history, improperly relied on notes of non-compliance, and failed to conduct a sufficient pain analysis.  (Pl.'s Br. at 14.)

In evaluating the credibility of a claimant's statements regarding her symptoms, the ALJ must first determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9.  If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged

_____

doctrine, forbidden to defend an ALJ's decision on grounds the ALJ did not embrace, e.g., Kastner v. Astrue, 697 F.3d 642, 648 (7th Cir. 2012), it is not surprising that the Commissioner relied on the same reasons.  Plaintiff further notes that the normal examination findings were not dispositive of her functional abilities (Pl.'s Rep. Br. at 6), but the ALJ never said they were; she simply cited these findings as one piece of evidence supporting her conclusion.  See Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010).  Plaintiff also takes issue with the Commissioner's contention that Dr. Berezovski may not have given the issues as much consideration because he did not complete the form.  (Pl.'s Rep. Br. at 6.)  I agree that this is speculative.  Further, while the opinion of a provider who does not qualify as an "acceptable medical source" may be given less weight, such opinions should be considered under the regulatory factors.  See Koschnitzke v. Barnhart, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003); see also Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014).  Here, the physician's assistant who prepared the report worked under the supervision of Dr. Berezovki.  If this had been the only reason the ALJ provided, remand might be warranted.  Finally, plaintiff argues that any portion of a doctor's report will be based on the patient's subjective statements, making this an improper basis for rejecting Dr. Berezovski's opinion.  (Pl.'s Rep. Br. at 7.)  However, the Seventh Circuit has repeatedly held that this is a relevant consideration, see, e.g., Britt v. Berryhill, 889 F.3d 422, 426 (7th Cir. 2018), one that seems particularly relevant here, where the provider specifically wrote into the pre-printed form: "Information obtained by patient interview."  (Tr. at 433.)

45

symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has received for relief of the pain or other symptoms. Id. at *18-19. The court reviews an ALJ's credibility finding deferentially, reversing only if it "patently wrong." Hall v. Berryhill, 906 F.3d 640, 644 (7th Cir. 2018); Summers, 864 F.3d at 528.[12]

In the present case, the ALJ concluded that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. at 23.) In support of this finding, the ALJ first noted that the objective medical evidence failed to substantiate the severity of the alleged limitations, as plaintiff was noted during office visits to be alert, oriented, well developed, and in no acute distress, and on exam she typically displayed only mildly to moderately reduced range of motion with full muscle strength and normal reflexes. The treatment notes also referenced improvement from pain medication, physical therapy, and shoulder surgery. Second, the ALJ noted instances of non-compliance with treatment, particularly with home exercises, stretching, and use of orthotics, which would have provided

---

[12]Plaintiff argues that because SSR 16-3p eliminated use of the term "credibility" from its predecessor, SSR 96-7p, the Seventh Circuit's "patently wrong" credibility standard should no longer apply. (Pl.'s Br. at 14.) The Seventh Circuit has explained: "The change in wording is meant to clarify that administrative law judges aren't in the business of impeaching claimants' character; obviously administrative law judges will continue to assess the credibility of pain assertions by applicants, especially as such assertions often cannot be either credited or rejected on the basis of medical evidence." Cole v. Colvin, 831 F.3d 411, 412 (7th Cir. 2016). The court of appeals continues to use the "patently wrong" standard. E.g., Hammerslough v. Berryhill, No. 18-1732, 2019 U.S. App. LEXIS 643, at *10 (7th Cir. Jan. 9, 2019); McHenry v. Berryhill, No. 18-1691, 2018 U.S. App. LEXIS 36511, at *14 (7th Cir. Dec. 26, 2018). Plaintiff cites no authority to the contrary.

additional relief from her symptoms and improve overall functioning. Third, the ALJ noted that plaintiff's daily activities, including managing her personal needs, performing some household chores, preparing meals, shopping, and driving, were not as limited as would be expected given her complaints of disabling symptoms and limitations. (Tr. at 26.)

Plaintiff first contends that the ALJ failed to make "a proper finding because complaints need not be 'entirely consistent' with evidence to be found credible, particularly, as in this case, where complaints of pain are concerned." (Pl.'s Br. at 15, citing Vanprooyen v. Berryhill, 864 F.3d 567, 562 (7th Cir. 2017); Villano v. Astrue, 556 F.3d 558, 562 (7th Cir. 2009); Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004).) She further notes that, under SSR 16-3p, an assessment of the claimant's credibility cannot be inferred or implied but must be clearly expressed and explained with supporting evidence. (Pl.'s Br. at 15.) While boilerplate phrases such as "not entirely consistent" are unhelpful, the Seventh Circuit has held that the use of such language does not require reversal where, as here, the ALJ goes on to provide specific reasons for her finding. See, e.g., Summers v. Colvin, 634 Fed. Appx. 590, 592 (7th Cir. 2016); Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012)); see also Boeck, 2017 U.S. Dist. LEXIS 161683, at *35-36.[13]

---

[13]In reply, plaintiff contends that the Commissioner did not address her argument that, by finding her complaints "not entirely consistent" with the evidence of record, the ALJ applied the wrong legal standard. (Pl.'s Rep. Br. at 7, citing Minger v. Berryhill, 307 F. Supp. 3d 865, 872 (N.D. Ill. 2018).) In Minger, the court concluded that the "not entirely consistent" template conflicts with the regulations, which require the ALJ to determine whether the claimant's "allegations 'can reasonably be accepted as consistent with the objective medical evidence and other evidence.'" Id. at 871 (quoting 20 C.F.R. § 416.929(a)). The court stated that "the ALJ's boilerplate indicates that he will be assessing the claimant's symptoms under a different standard – 'entirely consistent' – than required in the regulations – 'reasonably . . . accept[able] as consistent.' As a result, the discussion following the boilerplate doesn't rescue the opinion, because the ALJ might be applying the wrong standard in that discussion." Id. at 872. In her main brief (filed on May 2, 2018), plaintiff did not argue that the ALJ applied the wrong legal

Plaintiff next contends that the ALJ failed to consider her solid work history prior to the alleged onset date. (Pl.'s Br. at 16.) Although a good work record may be a factor in the claimant's favor, the Seventh Circuit has held that an ALJ does not commit reversible error by failing to explicitly discuss a claimant's work history when evaluating her credibility. <u>Summers</u>, 864 F.3d at 528 (citing <u>Stark v. Colvin</u>, 813 F.3d 684, 689 (7th Cir. 2016) ("An ALJ is not statutorily required to consider a claimant's work history[.]")); <u>see also</u> <u>Loveless v. Colvin</u>, 810 F.3d 502, 508 (7th Cir. 2016) ("[W]ork history is just one factor among many, and it is not dispositive. And here the ALJ's silence is not enough to negate the substantial evidence supporting the adverse credibility finding.").[14]

_____

standard or cite <u>Minger</u> (decided on April 20, 2018). Plaintiff's argument in the main brief was that the ALJ failed to make a "proper finding" because it was insufficiently specific, particularly given the subjective nature of pain (discussed in <u>Vanprooyen</u> and the cases cited there). (Pl.'s Br. at 15.) The Commissioner accordingly had no reason to address whether the ALJ applied the correct legal standard. Nor need I address the issue now, as arguments raised for the first time in reply are waived. <u>Brown v. Colvin</u>, 661 Fed. Appx. 894, 895 (7th Cir. 2016) (citing <u>Nationwide Ins. Co. v. Cent. Laborers' Pension Fund</u>, 704 F.3d 522, 527 (7th Cir. 2013)). In any event, the ALJ's later discussion demonstrates that she did not believe plaintiff's statements had to be entirely consistent with everything in the record in order to be accepted. (Tr. at 30 – finding plaintiff's statements "not fully persuasive" but including in the RFC sedentary exertion and postural limitations to accommodate back pain and reaching limitations to accommodate shoulder pain.)

[14]Plaintiff also faults the ALJ for considering her unsuccessful post-onset attempts to return to work as evidence of greater capacity than alleged. (Pl.'s Br. at 17.) I agree that this was, at least without further explanation, questionable. <u>See</u> <u>Czarnecki v. Colvin</u>, 595 Fed. Appx. 635, 644 (7th Cir. 2015) (reversing where the ALJ found work attempt inconsistent with alleged limitations without discussing the claimant's inability to meet the physical demands of the job). It was also questionable for the ALJ to consider plaintiff's post-onset work attempts but not her pre-onset work history. (Pl.'s Rep. Br. at 9.) However, this does not alone warrant remand. <u>See</u> <u>Halsell v. Astrue</u>, 357 Fed. Appx. 717, 722-23 (7th Cir. 2009) ("On balance, the flaws in the ALJ's reasoning are not enough to undermine the ALJ's decision that Halsell was exaggerating her symptoms. Not all of the ALJ's reasons must be valid as long as <u>enough</u> of them are, <u>see, e.g.</u> <u>Simila v. Astrue</u>, 573 F.3d 503, 517 (7th Cir. 2009); <u>Shramek v. Apfel</u>, 226 F.3d 809, 811 (7th Cir. 2000), and here the ALJ cited other sound reasons for disbelieving Halsell.").

Plaintiff next argues that the ALJ failed to discuss her use of strong narcotic medication, which her providers deemed necessary to treat her intractable and persistent pain. (Pl.'s Br. at 17.) Contrary to plaintiff's assertion, the ALJ did discuss this aspect of plaintiff's treatment regimen. (Tr. at 23 – "The claimant's treatment plan included medication for pain[.]"; Tr. at 24 – "The claimant's treatment plan included long-acting pain medication to improve qualify of life, activities of daily living, and sleep."; Tr. at 26 – "references to improvement from pain medication".) Plaintiff cites no authority for the proposition that the ALJ was required to find her allegation of disabling pain credible simply because she was prescribed pain medication. See Kolar v. Berryhill, 695 Fed. Appx. 161, 161 (7th Cir. 2017) ("The question . . . is whether substantial evidence supports the ALJ's ultimate decision – that Kolar's pain is mild enough to enable her to work, as millions of other persons with chronic pain do.").[15]

Plaintiff faults the ALJ for considering her non-compliance with treatment without fully questioning her about it at the hearing. (Pl.'s Br. at 18.) The ALJ must explore any reasons

---

[15]In reply, plaintiff cites Goble v. Astrue, 385 Fed. Appx. 588, 591 (7th Cir. 2010), where the court questioned the ALJ's reliance on the claimant's presentation during medical visits because none of those providers viewed her presentation as inconsistent with chronic pain, and they in fact continued to prescribe methadone and other medications as well as batteries of tests in response to her complaints of pain. (Pl.'s Rep. Br. at 10.) The court also noted the improbability that a claimant would undergo extensive pain-treatment procedures in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking. Id. (citing Carradine v. Barnhart, 360 F.3d 751, 755 (7th Cir. 2004)). Plaintiff makes no showing that her pain treatment regimen was as extensive as in Carradine; rather, as the ALJ noted, plaintiff had not required assistive devices, repeated emergency room visits, or in-patient hospital stays; and, she reported improvement from pain medication, physical therapy, and surgical repair of her shoulder. (Tr. at 26.) The Seventh Circuit has noted that the regulations expressly permit the ALJ to consider a claimant's treatment history, and that the court owes deference to an ALJ's factual determination regarding the extensiveness of the claimant's treatment. Simila, 573 F.3d at 519; see also Kolar v. Colvin, No. 13 CV 6011, 2016. LEXIS 12362, at *27 (N.D. Ill. Feb. 2, 2016) (collecting cases characterizing as conservative treatment consisting of pain pills, injections, and physical therapy), aff'd, 695 Fed. Appx. 161 (7th Cir. 2017).

for failure to follow a treatment plan before drawing a negative inference, <u>Shauger v. Astrue</u>, 675 F.3d 690, 696 (7th Cir. 2012), and the ALJ did so here, questioning plaintiff about her failure to do stretching exercises, purchase orthotics, and wear more supportive shoes. (Tr. at 55-56.) Plaintiff testified that she did the stretches and bought the insoles and shoes, but the ALJ was not required to accept that explanation over the contradictory reports of her doctors. <u>See</u> <u>Johnson v. Barnhart</u>, 449 F.3d 804, 805 (7th Cir. 2006) ("[T]he administrative law judge was not obliged to believe all her testimony. Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case.").[16] Plaintiff also notes that she was uninsured for a time after her employment ended (Pl.'s Br at 18-19), but she develops no argument as to how financial constraints excused the non-compliance the ALJ cited (e.g., failure wear supportive shoes and do home exercises).

Plaintiff next argues that the ALJ failed to undertake a proper pain analysis, relying on a lack of objective evidence. (Pl.'s Br. at 19.) Although an ALJ may not discredit a claimant's testimony <u>solely</u> because of a lack of objective medical support, <u>Villano</u>, 556 F.3d at 563, the ALJ is free to consider the objective medical evidence as part of her analysis. <u>See, e.g.</u>, <u>Pierce</u>, 739 F.3d at 1050 ("[T]he lack of objective support from physical examinations and test

---

[16]In reply, plaintiff complains that the ALJ did not in her decision explicitly discuss her testimony regarding the non-compliance. (Pl.'s Rep. Br. at 11.) As indicated, however, the ALJ need not address every piece of evidence and testimony in her decision. <u>See, e.g.</u>, <u>Jones v. Astrue</u>, 623 F.3d 1155, 1160 (7th Cir. 2010). Plaintiff also notes that the ALJ did not find a causal link between her non-compliance and her limitations. (Pl.'s Rep. Br. at 11, citing 20 C.F.R. § 404.1530). However, the ALJ did not deny benefits under the non-compliance regulation; rather, she cited non-compliance as part of her credibility analysis. <u>See</u> <u>Thao v. Astrue</u>, No. 08-C-0033, 2008 U.S. Dist. LEXIS 58775, at *22-23 (E.D. Wis. July 23, 2008) (distinguishing between violation of the non-compliance regulation and consideration of medical evidence in evaluating credibility).

results is still relevant even if an ALJ may not base a decision solely on the lack of objective corroboration of complaints of pain."); Getch v. Astrue, 539 F.3d 473, 483 (7th Cir. 2008) (noting that "discrepancies between objective evidence and self-reports may suggest symptom exaggeration"). The ALJ properly did so here.[17]

Plaintiff next argues that the ALJ relied on her daily activities without addressing her limitations in performing them or explaining how they showed she had the capacity for full-time work. (Pl.'s Br. at 19-20.) The ALJ never said that plaintiff's activities proved she could work full-time; rather, she said those activities were not as limited as one would expect given plaintiff's complaints of disabling symptoms and limitations. (Tr. at 26.) "[T]here is a critical difference between an ALJ improperly saying, the claimant can perform this range of activities, therefore he can work, see Roddy v. Astrue, 705 F.3d 631, 639 (7th Cir. 2013), and an ALJ reasonably saying that the claimant can perform this range of activities, therefore he can do more than he claims, see Pepper v. Colvin, 712 F.3d 351, 369 (7th Cir. 2013))." Fifield, 2017 U.S. Dist. LEXIS 188816, at *53; see also Alvarado, 836 F.3d at 750 ("[W]e have cautioned ALJs not to equate such activities with the rigorous demands of the workplace. But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated.") (internal citations and quote marks omitted).

## E. Third Party Report

Plaintiff criticizes the ALJ's decision to give only partial weight to the third-party

---

[17]In reply, plaintiff notes that symptoms may wax and wane, which may explain why the claimant does not always report the same pain level to her providers. (Pl.'s Rep. Br. at 9.) However, the ALJ reasonably noted that plaintiff consistently presented in no acute distress, which undercut her claim of daily, disabling pain.

questionnaire completed by Maya Hampton, plaintiff's daughter. (Pl.'s Br. at 20.) While the regulations require the ALJ to consider and generally explain the weight given to such reports, 20 C.F.R. § 404.1527(f), they are not entitled to the same sort of special consideration due treating source reports. See Brinley v. Berryhill, 732 Fed. Appx. 461, 466 (7th Cir. 2018). The ALJ satisfied her obligation here. The ALJ found Hampton's report generally consistent with treatment notes reflecting complaints of pain. However, she found Hampton's opinion regarding the severity and frequency of plaintiff's pain and symptoms, in particular that she lies in bed most of the time, inconsistent with plaintiff's own testimony and the treatment records showing plaintiff was routinely alert, oriented, and in no acute distress. (Tr. at 29-30.) The ALJ also found the report unsupported by the objective evidence, which showed mild to moderate pain, 5/5 muscle strength, and improvement when in compliance with her treatment plan. (Tr. at 30.)

Plaintiff disputes the alleged inconsistency between her testimony and Hampton's report (Pl.'s Br. at 20), but the record contains support for the ALJ's conclusion. Hampton wrote that plaintiff "lays in her bed most of the time." (Tr. at 185.) Plaintiff testified that on a typical day she would get up, wash her face and brush her teeth, and sit on the couch and watch TV. (Tr. at 45.) She later testified that three or four days per week her pain would be so severe she stayed in bed most of the day. (Tr. at 62.) Plaintiff also takes issue with the ALJ's notation that she appeared alert, oriented, and in no acute distress during medical appointments (Pl.'s Br. at 20-21), but as indicated above it was not unreasonable for the ALJ to conclude that plaintiff's presentation during these appointments undercut her claim of daily, debilitating pain. Finally, plaintiff fails (in her main brief) to address the ALJ's reliance on the objective medical record

to discount Hampton's report.[18]

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is affirmed, and this case is dismissed.  The Clerk shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 18th day of January, 2019.

/s Lynn Adelman
LYNN ADELMAN
District Judge

---

[18]In reply, plaintiff contends, without elaboration, that this evidence is not inconsistent. Courts have upheld credibility determinations based on similar findings.  See Kolar, 2016 U.S. Dist. LEXIS 12362, at *29 (finding that ALJ reasonably considered similar objective evidence as part of adverse credibility finding).